CONCOURSE REHABILITATION & NURSING CENTER INC. & Concourse Nursing Home, Plaintiffs–Appellants,

v.

Dennis P. WHALEN, Individually and as Commissioner of the New York State Department of Health., Defendant–Appellee.

Docket No. 00–9394.

United States Court of Appeals, Second Circuit.

Argued March 13, 2001.

Decided May 4, 2001.

Marvin Neiman, Neiman, Ginsburg & Mairanz, New York, NY, for Appellants.

Barbara K. Hathaway, Assistant Attorney General, for Eliot Spitzer, Attorney General of the State of New York (Michael S. Belohlavek, Deputy Solicitor General & Marion R. Buchbinder, Assistant Solicitor General, on the brief), for Appellees.

Cornelius D. Murray, O'Connel & Aronowitz, Albany, NY, filed a brief amici curiae for the New York State Health Facilities Association, Inc. and the Healthcare Association of New York State.

Harvey Weinberg, Weinberg, Kaley, Gross & Pergament, Garden City, NY, filed a brief amicus curiae for the Southern New York Association, Inc.

Before CARDAMONE, LEVAL, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Plaintiffs, the operators of a nursing facility that receives reimbursement for services under the New York State Medicaid plan, appeal from a judgment entered on October 20, 2000, in the Southern District of New York (Conti, *Judge*), following a grant of summary judgment in favor of the New York State Department of Health ("Department") on plaintiffs' claims that the facility was inadequately compensated by the Department for certain rehabilitative services provided to its patients and that such undercompensation constitutes a violation of federal Medicaid law. We affirm.

## Background

Plaintiffs, Concourse Rehabilitation & Nursing Center, Inc., and Concourse

Nursing Home (collectively "Concourse")[1], operate a 240–bed residential health care facility in the Bronx. As we explained in our previous opinion, *Concourse Rehabilitation & Nursing Center, Inc. v. DeBuono*, 179 F.3d 38, 42–43 (2d Cir.1999) (hereinafter *"DeBuono"*), this case arises from an audit conducted by the Department in 1996 and 1997, which concerned claims submitted by Concourse in May 1995. As a result of this audit, the Department determined that Concourse had misclassified the type of therapy provided to a number of its patients and had, as a result, been overcompensated for their care. *See id.* at 43. Concourse contends that the criteria used by the Department for making this determination violate the federal Medicaid Act (Title XIX of the Social Security Act), 42 U.S.C. §§ 1396, 1396a–u (1993 & Supp. IV 1998).

Although our previous opinion provides a thorough description of the statutory and regulatory scheme governing this case, *see DeBuono*, 179 F.3d at 40–42, it is useful to review that framework briefly here, before moving on to the arguments presented by the parties on appeal.

### A. The Medicaid Program

The Medicaid Program, which covers the costs of medical care for the indigent, is jointly funded by the federal government and the governments of participating States. *See DeBuono*, 179 F.3d at 41. Although States are not required to participate in the program, those electing to do so "must submit a plan to the U.S. Secretary of Health and Human Services (Secretary) for approval." *Id.* As we explained in *DeBuono*:

> The plan must be in writing and must comprehensively describe the nature and scope of the State's Medicaid program. Upon approval of the plan by the Secretary, the State becomes entitled to receive reimbursement from the federal government for a percentage of the monies it pays to residential health care facilities for their care of Medicaid patients. The balance of the costs for such care is furnished by State and local governments.

*Id.* Administration of the program is governed by the Medicaid Act, and the distribution of federal funds to the States for care provided in accordance with the individual State plans "must be approved by the Health Care Financing Administration [ ("HCFA") ], a division of the Department of Health and Human Services, according to standards contained in 42 U.S.C. § 1396a(a)." *Id.* When the dispute over the Department's audit of Concourse's submissions arose, HCFA's approval of federal funding was governed in part by a provision called the "Boren Amendment," 42 U.S.C. § 1396a(a)(13) (1994), which has since been repealed, *see id.*; Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711(a)(1), 111 Stat. 251, 507–08 (repealing the Boren Amendment for services provided after Oct. 1, 1997); note 2, *infra.* At that time, the Boren Amendment provided, in pertinent part, that:

> A State plan for medical assistance must—
>
> . . .
>
> provide . . . for payment . . . of the . . . nursing facility services . . . provided under the plan . . . through the use of rates (determined in accordance with methods and standards developed by the State which, in the case of nursing facilities, take into account the costs (includ-

---

1. Plaintiff Concourse Nursing Home operated the nursing facility in question from 1974 to September, 1995. Plaintiff Concourse Reha- bilitation & Nursing Center, Inc. has operated the facility since October, 1995.

ing the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this subchapter) of complying with subsections (b) (other than paragraph (3)(F) thereof), (c), and (d) of section 1396r of this title . . .) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards . . . .

42 U.S.C. § 1396a(a)(13)(A) (1994). Thus, under the then-existing Boren Amendment, States were required to assure the Secretary that their plans provided "reasonable and adequate" payment for costs incurred by "efficiently and economically operated facilities" in order to be eligible for federal funds. In *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509–10, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court held that the Boren Amendment afforded health care providers a substantive right—enforceable under 42 U.S.C. § 1983—to reasonable and adequate rates, in addition to a procedural right to have a State make the requisite findings.[2]

The Boren Amendment's reference to "services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits" has its origin in certain revisions made to the Medicaid and Medicare Acts as part of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, § 4211, 101 Stat. 1330–183 to –207 (1987) ("OBRA '87"). *See generally Indiana Ass'n of Homes for the Aging, Inc. v. Indiana Office of Medicaid Policy & Planning*, 60 F.3d 262, 265 (7th Cir. 1995) (describing the effect of OBRA '87 on the Medicaid program); *Valdivia v. California Dep't of Health Servs.*, No. S–90–1226EJG EM, 1991 WL 80896, at *2 (same) (E.D.Cal. Feb. 25, 1991). Under 42 U.S.C. § 1396r(b)(2)—one of the provisions added to the Medicaid Act by OBRA '87—"[a] nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with a written plan of care . . . ."

HCFA regulations expand upon this requirement, providing that if "specialized rehabilitative services . . . are required in

---

**2.** Section 1396a(a)(13)(A) now reads as follows:

A State plan for medical assistance must—
. . .
provide . . . for a public process for determination of rates of payment under the plan for . . . nursing facility services . . . under which—
(i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
(ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,

(iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
(iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1923) the situation of hospitals which serve a disproportionate number of low-income patients with special needs.

Thus, for services provided after October 1, 1997, Congress has eliminated the providers' substantive right to reasonable and adequate rates and has instead provided increased procedural rights.

the resident's comprehensive plan of care," the facility must either provide those services or obtain those services from an outside source. 42 C.F.R. § 483.45(a) (2000). More specifically:

> Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care.... [T]he facility must ensure that (1) A resident's abilities in activities of daily living do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable .... [and] (2) A resident is given the appropriate treatment and services to maintain or improve his or her abilities ..."

42 C.F.R. § 483.25 (2000). OBRA '87 provided for a range of civil penalties for providers found not to be in compliance with these requirements. *See* 42 U.S.C. § 1395i–3(h); *Valdivia*, 1991 WL 80896, at *2. It is the cost of such rehabilitative services that the former Boren Amendment requires States to "take into account." *See* 42 U.S.C. § 1396a(a)(13)(A) (1994).

### B. The New York State Medicaid Plan

Under New York's Medicaid plan, "the direct cost component of Medicaid reimbursements for a particular nursing home is gauged according to a 'case mix index,' which reflects the number of patients in the facility, the severity of each patient's diagnosis, and the consumption of resources required by patients with similar diagnoses." *DeBuono*, 179 F.3d at 42 (citing N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2.10(a)(5)). As the district court explained, "[t]he weighted sum of the distribution of a facility's patients in the various [diagnostic] categories determines the case mix index ("CMI"), which in turn determines the amount of the facilities['] reimbursement.... Accordingly, the higher the CMI, the greater the remuneration for the facility." In order to ensure that the case mix index for each facility is current and accurate, health care providers are required to submit periodically a "Patient Review Instrument" ("PRI") for each patient. *See id.* These PRIs may be audited—as they were in this case—by the Foundation for Quality Medical Care, under contract with the Department of Health. *See id.*

The PRI contains a number of standards, called "documentation qualifiers," which are used to assess a patient's medical condition to calculate the case mix index for a particular facility. *See id.* The qualifiers relevant to the instant dispute are used to determine whether a patient is in need of "maintenance therapy" or "restorative therapy." The qualifier for "maintenance therapy"—which is already included in the direct component paid to a provider, and thus does not result in a higher case mix index, *see* N.Y. Comp. Codes R. & Regs. tit. 10, § 86–2.10(c)(1)—states as follows:

> Therapy is provided to maintain and/or retard deterioration of current functional/ADL ["Activities of Daily Living"] status. Therapy plan of care and progress notes should support that patient has no potential for further or any significant improvement.

*Id.* (citing N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2.30(i) (Patient Review, Question 27)). For a patient to meet the qualifier for "restorative therapy," which increases a facility's case mix index and thus entitles the facility to a higher rate of reimbursement, one must find that:

> There is a positive potential for improved functional status within a short and predictable period of time. Therapy

plan of care and progress notes should support that patient has this potential/is improving.

*Id.* (citing N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2.30(i) (Patient Review, Question 27)). Additionally, the Department has created an "Audit Tool" for use in PRI audits, which was not a part of the State plan originally approved by HCFA, and which states that in order to be classified as receiving restorative—as opposed to maintenance—therapy, an auditor must find that the "[p]atient's condition is realistically expected to *improve* significantly within a reasonable (and generally predictable) period of time." *Id.* As the district court found, and as the parties agreed at oral argument, the Department interprets the "restorative therapy" qualifier "to mean that a facility can be reimbursed at the restorative therapy rate only where patients have shown actual improvement as a result of treatment." In explaining the prospective language used in the second sentence of the restorative therapy qualifier—that is, the statement that the "[t]herapy plan of care and progress notes should support that patient has this potential/is improving"—the Department contends that the language referring to a patient's "potential" applies only to new patients, and that otherwise the qualifier calculates payment rates based on the number of patients who are actually "improving."

### C. Case History

As indicated above, this case has its origins in an audit conducted by the Foundation for Quality Medical Care on behalf of the Department of Health. Following a three-stage audit, the Department determined that Concourse had incorrectly classified certain patients as having received restorative therapy, as opposed to maintenance therapy, resulting in the Department's overpaying Concourse in the amount of $514,000. *See DeBuono*, 179 F.3d at 43. The conclusion that Concourse had erred in its classification was based on the auditor's finding that certain patients receiving therapy classified as "restorative" had not "actually progressed" as a result of the therapy. On April 21, 1997, plaintiffs filed suit in federal court, alleging that: (1) the audit tool constituted an amendment of the State plan, and that the State violated federal law by instituting such an amendment without approval of HCFA; (2) the Department violated its own audit procedures; and (3) that they were deprived of due process of law. On June 30 1998, following a bench trial, the district court found for defendant on all three issues.

Plaintiffs appealed, and this court found: (1) that "the failure of a State authority to comply with State regulations cannot alone give rise to a § 1983 cause of action" and that the court therefore lacked jurisdiction over any such claims; and (2) that the audit tool did not amend the plan, but was instead an interpretation of the plan, which did not give rise to a section 1983 action because it did not have the "clear and unequivocal effect" of altering the written terms of the plan. *Id.* at 43–47. We vacated the district court's opinion and instructed the district court to dismiss the case for lack of jurisdiction. We recognized, however, that there were at least two arguments that could be raised if plaintiffs chose to refashion their complaint. First, we suggested that the plaintiffs remained free to argue that the State's plan, as interpreted, violated the plaintiffs' substantive right under the Boren Amendment to a reasonable and adequate rate of reimbursement. *See id.* at 47. Second, we left open a "novel argument" (which had been made only in a brief by one of the amici and in a footnote to the plaintiffs' reply brief) that the De-

partment's interpretation of the requirements for restorative therapy might be "preempted by federal law insofar as its practical effect is to prevent health care providers from complying with 42 U.S.C. § 1396r and 42 C.F.R. § 483." *See id.*

On July 8, 1999, plaintiffs filed an amended complaint advancing both of these arguments. On October 20, 2000, the district court entered an order granting the defendant's motion for summary judgment, finding: (1) that the State plan did not "conflict" with federal law, and that there was therefore no federal preemption; and (2) that the plaintiffs had failed to provide any evidence that the State's reimbursement rate as a whole was inadequate or unreasonable, or that the State failed to take the services required by OBRA '87 "into account" in formulating the rate. On this appeal, the plaintiffs challenge both of these findings, and contend that they were prevented from conducting adequate discovery on their Boren Amendment claim. They also claim—apparently for the first time in this litigation—that the State plan's failure to reimburse Concourse for services allegedly mandated by OBRA '87 constitutes a "taking" without due compensation under the Fifth Amendment of the United States Constitution.

## Discussion

■■■ We begin with the plaintiffs' claim under the Boren Amendment. Before we can turn to the merits of this claim, we must consider whether the claim is one that can properly be brought under 42 U.S.C. § 1983. Section 1983 "provides a cause of action for violations of federal statutes as well as the Constitution." *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (citing *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)). "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). "A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Wilder,* 496 U.S. at 508, 110 S.Ct. 2510 (quoting *Wright v. Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). A Court considering whether a particular statute gives rise to a § 1983 claim must first ask whether "the provision in question was intend[ed] to benefit the putative plaintiff." *Id.* at 509, 110 S.Ct. 2510 (quoting *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)) (internal quotation marks omitted); *see Blessing,* 520 U.S. at 340, 117 S.Ct. 1353. "If so, the provision creates an enforceable right unless it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is 'too vague and amorphous such that it is beyond the competence of the judiciary to enforce.'" *Wilder,* 496 U.S. at 509, 110 S.Ct. 2510 (citations omitted); *see Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353.

■■■ With this standard in mind, we turn to the two statutory provisions relied upon by the plaintiffs. First, we have the provisions of 42 U.S.C. § 1396r and its accompanying regulations that require nursing facilities to "provide ... specialized rehabilitative services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident." 42 U.S.C. § 1396r(b)(4)(A). It

is clear from the plain language of this provision that it was not "intend[ed] to benefit the putative plaintiff[s]"—here the health care providers. *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510. Rather, the provision is obviously intended to benefit Medicaid beneficiaries. We therefore find that 42 U.S.C. § 1396r does not entitle providers to bring suit under section 1983.

■ Second, we have the Boren Amendment, which requires States to "take into account" the costs of providing specialized rehabilitative services in formulating their Medicaid plans. Plaintiffs rely on the Supreme Court's decision in *Wilder* to support their contention that the Boren Amendment creates a federal right cognizable under section 1983. As indicated above, the Supreme Court, in *Wilder*, held that the Boren Amendment's requirement that State plans provide "reasonable and adequate" reimbursement did entitle health care providers to bring suits under § 1983, finding that (1) health care providers were the intended beneficiaries of the law, (2) the provision was mandatory, rather than hortatory in nature; (3) the requirement that reimbursement be reasonable and adequate was not too "vague or amorphous" to be judicially enforceable; and (4) that the alternative enforcement mechanisms within the Medicaid Act were not sufficient to evince a Congressional intent to foreclose the possibility of suits under section 1983. *See id.* at 510–23, 110 S.Ct. 2510. However, plaintiffs' claim here is based not merely on the Boren Amendment's requirement that reimbursement be 'reasonable and adequate' as a whole, but also on the Amendment's requirement that a State plan 'take into account' the costs of the services mandated by 1396r. Thus, Wilder does not provide a conclusive answer to the question whether plaintiffs can assert this particular claim under Section 1983.

But the Supreme Court's analysis in *Wilder* is instructive in several respects. First, the requirement that the costs of rehabilitative services be "taken into account"—like the requirement that reimbursement be "reasonable and adequate"—is clearly meant to benefit health care providers. *See Wilder*, 496 U.S. at 510, 110 S.Ct. 2510 ("There can be little doubt that health care providers are the intended beneficiaries of the Boren Amendment."). Similarly, we find that this provision is mandatory, and that defendant has failed to meet its burden in proving that Congress intended to foreclose this remedy. *See id.* at 512, 520–23, 110 S.Ct. 2510.

The more difficult question—and one not answered by *Wilder*—is whether the requirement that a State plan "take into account" the cost of rehabilitative services is "too vague and amorphous such that it is beyond the competence of the judiciary to enforce." *Wilder*, 496 U.S. at 509, 110 S.Ct. 2510. We find that it is not. Under the Medicaid Act, a State plan must "take into account" a wide range of factors in arriving at a reasonable and adequate system of reimbursement. *See id.* at 519 n. 17, 110 S.Ct. 2510. Certainly the courts are competent to consider an allegation that the State failed to consider a required factor in designing its compensation system. In fact, this is a much less complicated question than the question whether, on balance, the State's plan provides compensation that is "reasonable and adequate"— a question that the Supreme Court has found to be within the competence of the courts. *See id.* at 519–20, 110 S.Ct. 2510. We therefore find that this provision of the Boren Amendment confers on the plaintiffs the right to have the cost of rehabilitative services "taken into account" and that this right is enforceable under section 1983.

Under the law we are bound to follow, however, the plaintiffs have fallen considerably short of proving that the State failed to consider the costs of rehabilitative services in designing its plan. As the Supreme Court noted in *Wilder*, the Boren Amendment "gives the States substantial discretion in choosing among reasonable methods of calculating rates," *id.* at 519, 110 S.Ct. 2510, including the discretion to choose between prospective and retrospective approaches, *see id.* at 515, 110 S.Ct. 2510. We review the State plan under an "arbitrary and capricious" standard. *See Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir.1991); *see also Perry v. Dowling*, 95 F.3d 231, 236–37 (2d Cir.1996) (deferring to federally-approved State interpretation of federal Medicaid statute). Here, the State has taken into account the need and cost of rehabilitative therapy through its use of the restorative and maintenance therapy qualifiers. These qualifiers comport with the requirement in section 1396r that care providers offer therapy that will allow patients to attain (in the case of restorative therapy) or maintain (in the case of maintenance therapy) their highest practicable physical, mental and psychosocial well-being. *See* 42 U.S.C. § 1396r(b). The plaintiffs, therefore, wisely do not argue that the qualifiers themselves bring the State plan into conflict with the provisions of OBRA '87 contained in section 1396r. Rather, they contend that the alleged conflict is created by the State's use of an "actual improvement" standard as a part of its audit.

Plaintiffs argue, in effect, that while they must render care based on a prospective assessment of a patient's potential, the State provides reimbursement only upon a retrospective determination that such potential has been realized. Thus, they claim that they are denied reimbursement where the decision to render restorative therapy is well justified by an objective evaluation of a patient's potential for improvement, but where for whatever reason the patient fails to show actual improvement in response to the therapy. The combined features of the various governing laws obligate plaintiffs to incur the expense of treatment required "to attain ... the highest practicable ... well-being of each resident," while the audit tool withholds payment for that treatment unless the treatment succeeds in causing improvement. We acknowledge that plaintiffs' argument is not frivolous. Unquestionably, there are disadvantages in effectively withholding reimbursement where no actual improvement is shown. One could even argue that it tends to undermine the Medicaid Act's objective of achieving the highest well-being of each resident, as providers might be unwilling to incur the expense of providing the restorative therapy necessary to achieve improvement unless reasonably certain of being able to recover the costs.

Nonetheless, while recognizing criticisms that can be made of the audit tool, we cannot say it is "arbitrary or capricious." In our view, it is supported by at least two reasons: First, because physicians' assessments of potential for improvement necessarily depend on the physicians' observations of the patient, cases of fraudulent or abusively optimistic assessments of potential for improvement would be very difficult to audit effectively after the fact to determine whether the physician's recorded observations were justified. Second, if a particular facility were frequently unable to show improvement by patients who received restorative therapy, in all likelihood this would mean either that the facility's doctors were indiscriminately prescribing restorative therapy where there was no "positive potential for

improved functional status within a short and predictable period of time," or that the facility was administering inefficient or incompetent treatment, such that achievable improvement in the patients was not being achieved.

Thus, the audit tool functions as a check on fraudulent or abusively optimistic assessments of potential for improvement, and as a rough (but reasonable) proxy for the number of patients who ought to be receiving restorative therapy. So long as it is not shown to result in unfair or unreasonable rates of reimbursement, it is not arbitrary or capricious. In sum, the State plan does "take into account" the costs of providing those rehabilitative services required by OBRA '87. Although it may not do so in the manner that care providers such as the plaintiffs might like, we cannot conclude that its actions are arbitrary and capricious. We therefore affirm the district court's grant of summary judgment on this claim.[3]

Plaintiffs' preemption claim fails for similar reasons. Under the preemption doctrine, which is based on the Supremacy Clause, "state law is nullified to the extent that it *actually conflicts* with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (citation omitted)(emphasis added); *see Geier v. American Honda Motor Co.*, 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287–90, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). We find no such "actual conflict" here. Although the State's interpretation of its own plan might tempt nursing facilities into erring on the side of maintenance therapy, which, if inappropriate, would arguably violate federal Medicaid regulations, *see Medicare Program, Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities—Update*, 65 Fed.Reg. 46774 (July 31, 2000), this potential effect is too speculative to warrant a finding of preemption. One might as easily presume that the plan will result in more careful monitoring of patient's progress to ensure that unnecessary rehabilitative services are not being prescribed, or that the actual improvement standard will encourage providers to provide effective treatment. Moreover, the use of the actual-improvement standard is not an unreasonable way to estimate the true number

---

**3.** Plaintiffs argue on appeal that the district court did not allow them to conduct sufficient discovery on their claim that the rates of payment under the audit tool qualifier are unreasonable and inadequate before it entered summary judgment. Defendant points to Federal Rule of Civil Procedure 56(f), which—as glossed by relevant caselaw in this Circuit-requires that a party opposing summary judgment on the ground that further discovery is necessary submit an affidavit showing: "(1) what facts are sought .. and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why

the affiant was unsuccessful in those efforts." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (internal quotation marks and citations omitted). "Indeed, the failure to file such an affidavit is fatal to a claim ... even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law." *Id.* at 43–44; *see also Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994).

In this case, plaintiffs did not submit an affidavit pursuant to Rule 56(f), but merely suggested in two footnotes in its supplemental brief to the court below that further discovery might be needed. Plaintiffs' argument is therefore unavailing.

of patients who ought to be receiving restorative therapy. Because there is no actual conflict between the State plan and federal law, we affirm the district court on this claim.

■ Finally, plaintiffs argue that the use of the "actual improvement" standard violates the Takings Clause of the Fifth Amendment. We decline to consider this claim, as it was raised for the first time on this appeal. *See, e.g., Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 608–09 (2d Cir.2001); *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 106 (2d Cir.2000).

This is not to say that the plaintiffs are without recourse; they have simply chosen the wrong forum in which to bring their claims. There exists a colorable claim that the State's use of the "actual improvement" standard—which appears nowhere in the State plan—conflicts with the relevant qualifiers and therefore violates the State's plan. However, as we have previously noted, the failure of a State to comply with its own plan is a matter of state law that cannot properly be brought before the federal courts. *See DeBuono*, 179 F.3d at 43.

### Conclusion

Having considered all of plaintiffs' arguments, we affirm the judgment of the district court.