

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-20-2008

# Newark Parents Assn v. Newark Pub Sch

Precedential or Non-Precedential: Precedential

Docket No. 07-4002

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Newark Parents Assn v. Newark Pub Sch" (2008). *2008 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-4002

———————

NEWARK PARENTS ASSOCIATION; ALBERTA GREEN;
HABIBULLAH SALEEM; ANDREA SMITH,
Appellants

v.

NEWARK PUBLIC SCHOOLS; MARION A. BOLDEN,
Superintendent, Newark Public Schools,
in her individual and official capacities;
JANET CHAVIS, Supervisor, Title 1 Office,
Newark Public Schools, in her individual and
official capacities; JOANN TROTMAN, Supervisor,
Title 1 Office, Newark Public Schools, in her
individual and official capacities

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 06-cv-05690)
District Judge:  The Honorable Susan D. Wigenton

———————

Argued:  September 25, 2008

———————

Before:  BARRY, AMBRO  and JORDAN, Circuit Judges

(Opinion Filed: November 20, 2008)

———————

Scott M. Michelman, Esq. (Argued)

American Civil Liberties Union
1101 Pacific Avenue
Santa Cruz, CA 95060
         -AND-
Emily B. Goldberg, Esq.
Seton Hall Law School
833 McCarter Highway
Newark, NJ 07102-0000

Counsel for Appellants


Adam S. Herman, Esq. (Argued)
Newark Public Schools
Office of General Counsel
2 Cedar Street, 10th Floor
Newark, NJ 07102-0000

Counsel for Appellees


———————


OPINION OF THE COURT

———————


BARRY, Circuit Judge

Appellants are a putative class of parents of children enrolled in the public elementary and middle schools of Newark, New Jersey, and an organization that represents them. They brought suit against appellees, Newark's public school system and various school administrators, under the No Child Left Behind Act ("NCLBA" or the "Act"), 20 U.S.C. § 6301 *et seq.*, and 42 U.S.C. § 1983. The complaint alleges that because the Newark public school system has failed to live up to its obligations under certain provisions of the Act, appellants are entitled to privately enforce those provisions. Appellees moved to dismiss and the District Court granted the motion, concluding that Congress did not confer on individuals an enforceable right of action under the Act. Deciding what is an issue of first impression in the federal courts

2

of appeals, we will affirm.

## I. The No Child Left Behind Act

**A.      The Act's Purpose and Its Funding Provisions**

Congress enacted the Act pursuant to its spending power. *See* U.S. Const. art. I, § 8, cl. 1.  The Act, at its outset, states that its purpose is "to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." 20 U.S.C. § 6301 (footnote omitted).  This eminently laudatory purpose is to be accomplished by, among other things,

> holding schools, local educational agencies, and States accountable for improving the academic achievement of all students, and identifying and turning around low-performing schools that have failed to provide a high-quality education to their students, while providing alternatives to students in such schools to enable the students to receive a high-quality education.

*Id.* § 6301(4).

As with other legislation enacted under Congress's spending power, the Act offers a simple quid pro quo:  Congress shall appropriate funds to a State educational agency[1] if it agrees to take certain specific actions.  The State, in turn, appropriates those funds to its local educational agencies (referred to alternatively as "LEAs") for the purpose of helping schools to improve in accordance with the Act.  *See id.* §§ 6302(i), 6303(g), 6311(a)(1), 6316(a)(1).  To become eligible for federal funding, the State educational agency must first submit to the U.S. Secretary of Education a plan demonstrating that "the State has adopted challenging academic content standards and challenging student academic achievement standards that will be used by the State, its

---

[1]  The Act refers interchangeably to a "State" and a "State educational agency."

3

local educational agencies, and its schools." *Id.* § 6311(b)(1)(A). The State plan shall, among other things, "demonstrate that the State has developed and is implementing a single, statewide State accountability system that will be effective in ensuring that all local educational agencies, public elementary schools, and public secondary schools make adequate yearly progress." *Id.* § 6311(b)(2)(A). The State is tasked with defining "adequate yearly progress" in a "statistically valid and reliable" manner that uniformly applies "the same high standards of academic achievement" to all of its schools. *Id.* § 6311(b)(2)(C)(i)-(ii).

Every local educational agency receiving funds under the Act is obligated to "use the State academic assessments and other indicators described in the State plan to review annually the progress of each school served under this part to determine whether the school is making adequate yearly progress." *Id.* § 6316(a)(1)(A). If a local educational agency determines that a school has failed to make "adequate yearly progress" for two consecutive years, the agency shall identify the school for "school improvement." *Id.* § 6316(b)(1)(A). If, for two years after being identified as requiring "school improvement," a school continues to fail to achieve "adequate yearly progress," the agency shall identify the school for "corrective action." *Id.* § 6316(b)(7)(C). If, after one full school year of "corrective action," the school continues to fail to achieve "adequate yearly progress," the agency shall identify the school for "restructuring." *Id.* § 6316(b)(8)(A)-(B).

## B. The Act's Notification and Supplemental Educational Services Provisions

If a school is identified for "improvement," "corrective action," or "restructuring," the local educational agency

> shall promptly provide to a parent or parents . . . an explanation of what the identification means, . . . the reasons for the identification[,] . . . an explanation of what the school identified for school improvement is doing to address the problem of low achievement[,] . . . an explanation of what the local educational agency or State educational agency is doing to help

4

the school address the achievement problem[, and] .
. . an explanation of how the parents can become
involved in addressing the academic issues that
caused the school to be identified for school
improvement.

*Id.* § 6316(b)(6)(A)-(E).[2]  Importantly, this written explanation
must also provide "an explanation of the parents' option to transfer
their child to another public school . . . or to obtain supplemental
educational services for the child."  *Id.* § 6316(b)(6)(F); *see also id.*
§§ (b)(1)(E), (b)(5)(A), (b)(7)(C)(i), (c)(10)(C)(vii).  As for
supplemental educational services (referred to alternatively as
"SES"),

the local educational agency serving such school
shall . . . arrange for the provision of supplemental
educational services to eligible children in the school
from a provider with a demonstrated record of
effectiveness, that is selected by the parents and
approved for that purpose by the State educational
agency in accordance with reasonable criteria.

*Id.* § 6316(e)(1).

A parent's right to obtain supplemental educational services
for his or her child, however, is qualified in that children from low-
income families and children with the lowest achievement levels
are prioritized.  The Act provides that the local educational agency
is obligated to arrange for the provision of supplemental
educational services to "eligible children," *id.* § 6316(e)(1), with
"eligible child" defined to mean "a child from a low-income
family, as determined by the local educational agency," *id.* §
6316(e)(12)(A).  If the amount of funds allocated to a local
educational agency to provide supplemental educational services

---

[2]  As noted, such notification shall be "promptly" given.
Another sub-section of the Act, however, addresses the notification
to be given in the event a school is identified for improvement, and
states that the local educational agency shall give students' parents
notice "not later than the first day of the school year following such
identification."  20 U.S.C. § 6316(b)(1)(E)(i).

5

is insufficient to provide those services to every eligible child, the local educational agency is directed to give priority to the lowest-achieving children. *Id.* § 6316(b)(10)(C). The State may, at the request of a local educational agency, waive the obligation of the local educational agency to provide supplemental educational services if the State determines that no eligible supplemental educational services provider is located close enough to the local educational agency, and the agency demonstrates that it cannot provide the services. *Id.* § 6316(e)(10)(A).

Students' parents are also entitled to be notified, on an annual basis and regardless of the status of the child's school, of their right to request and receive information concerning their children's teachers' qualifications. More specifically,

> [a]t the beginning of each school year, a local educational agency that receives funds under this part shall notify the parents of each student attending any school receiving funds under this part that the parents may request, and the agency will provide the parents on request (and in a timely manner), information regarding the professional qualifications of the student's classroom teachers.

*Id.* § 6311(h)(6)(A).

## C.     The Act's Enforcement Provision

The Act includes a "Penalties" section, which provides as follows: "If a State fails to meet any of the requirements of this section . . . then the Secretary may withhold funds for State administration under this part until the Secretary determines that the State has fulfilled those requirements." *Id.* § 6311(g)(2). The provision does not offer any remedy to parents in the event of noncompliance by a State or a local educational agency with any of the Act's terms.

## II.  Factual and Procedural Background

## A.     The Complaint

The complaint, filed on November 28, 2006, names as plaintiffs a class consisting of the Newark Parents Association, a non-profit organization that represents parents (or guardians) of children attending certain public elementary and middle schools in Newark, New Jersey. The named defendants are Newark Public Schools, which is the corporate body charged with managing Newark's eighty-one public schools and the local educational agency responsible for those schools; and individual administrators of the schools.

The complaint alleges that the number of Newark public schools "in Need of Improvement" under the Act, which the complaint defines as "Failing Schools" (J.A. 24), was thirty-seven for the 2003-2004 school year, forty-seven for the 2004-2005 school year, forty-eight for the 2005-2006 school year, and fifty-one for the 2006-2007 school year. (*Id.* at 26-27.) It further alleges that on September 14, 2005, the U.S. Department of Education's Office of the Inspector General issued a report of an audit of five New Jersey school districts, including Newark Public Schools. The audit found that during the 2004-2005 school year, defendants "failed to meet even the minimum NCLB[A] Notice Provisions pertaining to parents' rights to transfer their children to a non-failing school and to obtain SES for their children." (*Id.* at 27.)

It is undisputed that those members of the proposed class who are parents all have children enrolled in schools that qualify as schools in need of improvement under the Act. The parents claim that, in contravention of the Act, they were never notified (or received insufficient notification) of (1) the fact that their children were enrolled in deficient schools, (2) their right to transfer from failing schools to non-failing schools, (3) their right to request supplemental educational services under the Act and to receive certain information about providers of such services, and (4) their right to request information about the professional qualifications of the teachers instructing their children. The class also includes parents who learned, independent of defendants, of their right to obtain supplemental educational services, and who then sought but were denied such services for their children. The complaint alleges that Newark Public Schools responded to these requests by giving the parents two "Notification Packets" that Newark Public Schools

7

claimed had been mailed to parents for the 2005-2006 school year. (*Id.* at 29.) The parents, it is alleged, never received the packets but, even if they had, those packets would have been deficient under the Act.

The complaint sets forth five causes of action invoking the Act and 42 U.S.C. § 1983. Focusing only on the Act, plaintiffs' first cause of action alleges that defendants' failure to provide them with notice (or, alternatively, with adequate notice) of the failing status of their children's schools violates 20 U.S.C. § 6316(b)(6). The second cause of action alleges that defendants' failure to provide plaintiffs with notice (or adequate notice) of their right to transfer their children out of a failing school to a non-failing school violates 20 U.S.C. §§ 6316(b)(1)(E) and 6316(b)(6)(F). The third cause of action alleges that defendants' failure to provide plaintiffs with notice (or adequate notice) of their right to request supplemental educational services for their children who were attending failing schools in Year 2 or higher violates 20 U.S.C. §§ 6316(b)(6)(F) and 6316(e)(2). The fourth cause of action alleges that defendants' failure to provide plaintiffs with notice (or adequate notice) of their right to request information about the professional qualifications of their children's teachers violates 20 U.S.C. § 6311(h)(6). The fifth and final cause of action alleges that defendants' denial of and interference with plaintiffs' right to request and/or receive supplemental educational services for their children who were attending failing schools in Year 2 or higher violates 20 U.S.C. § 6316(e)(1)-(2).

Plaintiffs sought class certification, a declaration that defendants had violated the Act by failing to comply with its mandatory notice provisions, an injunction ordering defendants to comply with the Act's notice and supplemental educational services obligations, compensatory education for all eligible students, and reasonable attorneys' fees and costs.

8

## B.     The District Court's Decision

The District Court granted defendants' Rule 12(b)(6) motion in an opinion and order dated September 19, 2007.  The Court made clear at the outset that two cases would guide its analysis: *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004).

As discussed in more detail below, the *Gonzaga* Court held that the Family Educational Rights and Privacy Act of 1974 ("FERPA") did not confer on private individuals a right to enforce its terms.  The District Court determined that the FERPA provisions at issue in *Gonzaga* were very similar to the NCLBA's provisions under which plaintiffs were seeking relief.  The Court also found the overall structure of the statutes to be similar, explaining those similarities as follows:

> Although both FERPA and NCLBA ultimately benefit students, the two statutes focus on monitoring schools, not on individual students who attend those schools.  Similarly, under the NCLBA the benefits that should ultimately trickle down from the State to individual students are "two steps removed from the interests of individual students."

(J.A. 12 (quoting *Gonzaga*, 536 U.S. at 287).)

The District Court found, as well, that the statutes had a similar "overall aggregate focus."  (*Id.*)  The Court explained that, as was the case in *Gonzaga*, the Act's references to its ultimate beneficiaries, i.e., students and their parents, are made only secondarily.  That is, the primary focus is on regulating the State by obligating it to notify parents in certain circumstances; it is only through that regulation that students and their parents benefit.  The Court, therefore, concluded as follows:

> [R]eferences made to individual parents and children in § 6316 are in terms of what would constitute a violation of the Act—specifically, failing to provide parents with adequate notice.  Under *Gonzaga*, if

9

reference to the individual benefited under the statute is only made in the context of describing the "type of 'policy or practice' that triggers a funding prohibition," it is insufficient to confer individually enforceable rights under § 1983.

(*Id.* at 13 (quoting *Gonzaga*, 536 U.S. at 288).)

The District Court then discussed *Sabree*. In *Sabree*, we held that Title XIX of the Social Security Act conferred an enforceable right on the mentally retarded individuals who were seeking relief under that statute. The Court did not compare the statutory language at issue in *Sabree* with the relevant language of the Act. It found, however, that both *Sabree* and *Gonzaga* emphasized the proposition that "clear, individually focused statutory language was required before the Court could find congressional intent to create an enforceable individual right." (*Id.* at 14.) Because the Court found that the Act did not confer an "unambiguously conferred right" upon students' parents, it did not find it necessary to reach the issue of whether Congress foreclosed the use of § 1983 as a remedy through which any such right could be vindicated. (*Id.* at 14-15.)

Notice of appeal was timely filed. We have jurisdiction over the appeal under 28 U.S.C. § 1291. Our review of a dismissal for failure to state a claim is *de novo*. *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

10

### III. Discussion

Appellants argue that, in contravention of Supreme Court precedent, the District Court only analyzed the Act as a whole and failed to analyze the specific provisions under which their claims are brought. They also argue that the Court did not meaningfully apply our holding in *Sabree*, and had it done so, it would have been compelled to find that a private right of action exists under the Act because the statutory provisions at issue in *Sabree* are "structurally identical to those at issue here."[3] (Appellants' Br. 22.)

Separate and apart from whether the District Court's analysis of the Act was as thorough as appellants would have had it be, the Court reached the correct conclusion. We will proceed to explain why that is so.

### A.     Private Right of Action Precedent

The parties do not dispute that 42 U.S.C. § 1983[4] provides

---

[3] Appellants argue, as well, that the Act's legislative history supports a finding of an enforceable private right of action and that appellees waived any right they may have had to argue that Congress foreclosed the use of § 1983 to sue under the Act. Because we conclude that the statutory language does not show that Congress unambiguously intended to confer on individuals an enforceable right of action under the Act, we need not reach these arguments.

[4] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

a remedy by means of which an aggrieved individual may vindicate rights conferred on him or her by federal statute. *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980). The federal statute under which suit is brought provides the right; section 1983 provides the remedy through which that right is vindicated. The question before us is whether the NCLBA provides aggrieved individuals an enforceable right. In a series of opinions, culminating in its 2002 decision in *Gonzaga*, the Supreme Court has addressed the broader question of when a statute provides an individual with an enforceable right. We applied *Gonzaga* and discussed the cases that preceded it in *Sabree*. It is useful, we believe, to lay the groundwork for what follows by briefly discussing the Court's decision in *Gonzaga* and our decision in *Sabree*, the two decisions on which the parties and the District Court quite appropriately focused their attention.

### 1.    *Gonzaga University v. Doe*

*Gonzaga* concerned a student enrolled at Gonzaga University who brought suit against the University under FERPA after he learned that, in violation of FERPA's nondisclosure provisions, a University official had disclosed to a potential employer (a public elementary school) that he had been accused of committing acts of sexual misconduct against another student. Plaintiff claimed that the statutory regime of FERPA conferred on him a federal right, enforceable in a suit for damages under § 1983, not to have his records disclosed to unauthorized persons without consent. One of the nondisclosure provisions stated as follows: "'No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization.'" *Gonzaga*, 536 U.S. at 279 (quoting 20 U.S.C. § 1232g(b)(1)).

The Court began by noting that statutes enacted by Congress under its spending power will rarely provide a private cause of action to individuals. Indeed, it emphasized that "'[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" *Id.* at 280

12

(quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). The Court was explicit: "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Id.* (quoting *Pennhurst*, 451 U.S. at 17, 28 & n.21) (alteration in original). It noted that only twice since its decision in *Pennhurst* had it "found spending legislation to give rise to enforceable rights." *Id.*

The Court went on to address "[s]ome language in [its] opinions [that] might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983." *Id.* at 282. After reiterating the three factors set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), that "guide judicial inquiry into whether or not a statute confers a right," *id.*, the Court explained the source of the confusion:

> . . . *Blessing* emphasizes that it is only violations of *rights,* not *laws,* which give rise to § 1983 actions. This confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action. Fueling this uncertainty is the notion that our implied private right of action cases have no bearing on the standards for discerning whether a statute creates rights enforceable by § 1983.

*Id.* at 282-83 (citation omitted). The Court then held: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283. It emphasized that it was rights and not "the broader or vaguer 'benefits' or 'interests,' that may be enforced." *Id.* Finally, it stated that "we further reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* Thus, "[f]or a statute to create such

13

private rights, its text must be 'phrased in terms of the persons benefited.'" *Id.* at 284 (citation omitted). It offered as examples of statutes that create enforceable private rights Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 because they are phrased "'with an *unmistakable focus* on the benefited class.'" *Id.* (citation omitted).

Applying these principles to FERPA's nondisclosure provisions, the Court held that they failed to confer enforceable rights:

> To begin with, the provisions entirely lack the sort of "rights-creating" language critical to showing the requisite congressional intent to create new rights. Unlike the individually focused terminology of Titles VI and IX ("No person . . . shall . . . be subjected to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "*individual* entitlement" that is enforceable under § 1983.

*Id.* at 287 (citations omitted). It further explained that the nondisclosure provisions spoke "only in terms of institutional policy and practice, not individual instances of disclosure." *Id.* at 288. Those provisions consequently had an aggregate focus; they did not concern "whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights. Recipient institutions can further avoid termination of funding so long as they comply substantially with the Act's requirements." *Id.* (internal quotation marks and citations omitted). Finally, the Court found that the enforcement mechanism provided by Congress, which vested sole enforcement power in the Secretary of Education, buttressed its conclusion that FERPA's nondisclosure provisions did not confer enforceable rights: "Congress expressly authorized the Secretary of Education to '*deal with violations*' of the Act, and required the Secretary to 'establish or designate [a]

14

review board' for investigating and adjudicating such violations." *Id.* at 289 (alteration in original)(citations omitted).

## 2. *Sabree ex rel. Sabree v. Richman*

In *Sabree*, the issue was whether Title XIX of the Social Security Act, known as the "Medicaid Act," which "established a cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons," conferred on aggrieved individuals an enforceable private right of action. 367 F.3d 180, 182 (3d Cir. 2004) (internal quotation marks and citation omitted). States that accepted funding under the Act were required to comply with its terms and any regulations promulgated under them, including a term requiring the creation and implementation of a "state medical assistance plan" that had been approved by the Secretary of Health and Human Services. *Id.*

Plaintiffs brought suit under a number of provisions of the Medicaid Act. The first provision sued under, 42 U.S.C. § 1396a(a)(8), provided as follows: "'A State plan for medical assistance *must . . . provide* that *all individuals* wishing to make application for medical assistance under the plan shall have opportunity to do so, and that *such assistance shall be furnished with reasonable promptness to all eligible individuals . . . .*'" *Id.* at 182 n.4 (quoting 42 U.S.C. § 1396a(a)(8)) (emphasis added). The second provision, 42 U.S.C. § 1396a(a)(10), provided: "'A State plan for medical assistance *must . . . provide . . .* for making medical assistance available, . . . *to . . . all* [eligible] *individuals . . . .*'" *Id.* at 182 n.5 (quoting 42 U.S.C. § 1396a(a)(10)) (emphasis added) (brackets in original). And the third provision, 42 U.S.C. § 1396d(a)(15), provided: "'For purposes of this title [42 U.S.C. §§ 1396 et seq.] . . . [t]he term 'medical assistance' means payment of part or all of the cost of the following care and services . . . *for individuals* . . . who are [eligible:] . . . services in an intermediate care facility for the mentally retarded. . . .'" *Id.* at 182 n.6 (quoting 42 U.S.C. § 1396d(a)(15)) (emphasis added) (alterations in original).

We began by explaining that the *Blessing* Court, having drawn on a number of the Court's prior decisions, had formulated

a three-prong test to determine whether Congress had conferred enforceable individual rights in a statute. Under that test, "a statute must (1) be intended by Congress to benefit the plaintiff, (2) not be 'vague and amorphous,' and (3) impose an unambiguous 'binding obligation on the States.'" *Sabree*, 367 F.3d at 186 (quoting *Blessing*, 520 U.S. at 340-41). We noted that while *Gonzaga* had not abandoned this test,

> it did dispel "[the] confusion [that] has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action."

*Id.* at 186-87 (quoting *Gonzaga*, 536 U.S. at 283) (alterations in original).

With these principles in mind, we turned to the text of the Medicaid Act to determine whether it used rights-creating language. We found that it did, and that the language used was "clear and unambiguous." *Id.* at 189. We stated that "we can hardly imagine anyone disputing that a state must provide the assistance necessary to obtain ICF/MR services, and that it must do so with 'reasonable promptness,' and the government does not do so." *Id.* Next, we stated that in order "[t]o determine whether these provisions provide plaintiffs with unambiguously conferred rights, we begin with what has come to be called the '*Blessing* Test,'" *id.*, i.e., the three-prong test discussed above. We found that that test was satisfied because "(1) plaintiffs were the intended beneficiaries of §§ 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8); (2) the rights sought to be enforced by them are specific and enumerated, not 'vague and amorphous'; and (3) the obligation imposed on the states is unambiguous and binding." *Id.*

Because *Gonzaga* had held that satisfaction of the *Blessing* test may only indicate that a plaintiff falls within the "'general zone of interest that the statute is intended to protect,'" however, we turned again to the text of the Medicaid Act to determine whether

16

Congress had used "'rights-creating terms.'" *Id.* at 189-90 (quoting *Gonzaga*, 536 U.S. at 287). We concluded that the import of the relevant language of the Act was "difficult, if not impossible" to distinguish from the relevant language of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972—the two statutes cited by the *Gonzaga* Court to contain archetypal rights-creating language.

> Just as in Titles VI and IX, the relevant terms used in Title XIX are "mandatory rather than precatory." Further, the "individual focus" of Sections 1396a(a)(10), 1396d(a)(15), and 1396a(a)(8) is unmistakable. The relevant Title XIX provisions enumerate the entitlements available to "all eligible individuals." The provisions do not focus on "the [entity] . . . regulated rather than the individuals protected." Neither do the statutory references to the individual appear "in the context of describing the type of 'policy or practice' that triggers a funding prohibition."

*Id.* at 190 (citations omitted) (brackets in original)

But, we continued, the *Gonzaga* Court had instructed that "not only should the text of the statute be examined, but also its structure." *Id.* at 191. Turning to the general structure of the Medicaid Act—that is, its other provisions viewed in the aggregate—we conceded that it gave us "some pause." *Id.* Its opening section, for instance, stated that "Title XIX was enacted '[f]or the purpose of enabling each State . . . to furnish . . . medical assistance.'" *Id.* (quoting 42 U.S.C. § 1396) (brackets in original). We acknowledged that "[t]his language says nothing of individual entitlements or rights, but reminds us that we are dealing with an agreement between Congress and a particular state." *Id.* We then turned to § 1396c of the statute, which we explained "empowers the Secretary of HHS to suspend payments to a state if it fails to 'comply substantially' with the requirements of Title XIX." *Id.* We concluded that "[t]his language not only confirms that Title XIX by its terms creates a relationship between Congress and a particular state, but it recalls, as well, the 'comply substantially' language in *Blessing* and *Gonzaga University*." *Id.* at 191-92.

17

Balanced against the specific rights-creating language discussed above, however, we held, in what was a very close case, that the Medicaid Act conferred rights that the plaintiffs could enforce. *Id.* at 192.

**B.    The NCLBA's Notice and Supplemental Educational Services Provisions Do Not Confer a Private Right of Action Upon Aggrieved Individuals**

We return to the case before us.  As we noted at the outset, no federal court of appeals has decided whether the Act's various notice and supplemental educational services provisions confer on individuals a private right of action to enforce those provisions.  It is worthy of mention, however, that every district court that has decided the question has held that, whatever the provision at issue, the Act does not confer a right of action enforceable by individuals or individual providers of supplemental educational services.[5]

We begin, as we must, by looking at the three provisions of the Act under which appellants seek relief: 20 U.S.C. § 6316(b)(6), 20 U.S.C. §§ 6316(e)(1)-(2), and 20 U.S.C. § 6311(h)(6).  As set forth in greater detail above, the Act's notice provision (20 U.S.C. § 6316(b)(6)) states that in the event a school is identified for "improvement," "corrective action," or "restructuring," the local educational agency "shall promptly provide to a parent or parents"

---

[5]    *See Simmons v. Santa Cruz County Dep't of Educ.*, No. 07-04064, 2008 WL 1777384, at *2 (N.D. Cal. Apr. 18, 2008); *Catapult Learning, Inc. v. Bd. of Educ. of St. Louis*, No. 4:07-935, 2007 WL 2736271, at *4 (E.D. Mo. Sept. 17, 2007); *Holder v. Gienapp*, No. 06-221, 2007 WL 952039, at *2 (D.N.H. Mar. 28, 2007); *Alliance For Children, Inc. v. City of Detroit Pub. Schs.*, 475 F. Supp. 2d 655, 662-63 (E.D. Mich. 2007); *Blanchard ex rel. Blanchard v. Morton Sch. Dist.*, No. 06-5166, 2006 WL 2459167, at *4 (W.D. Wash. Aug. 25, 2006); *Stokes ex rel. K.F. v. U.S. Dep't. of Educ.*, No. 05-11764, 2006 WL 1892242, at *2 (D. Mass. July 10, 2006); *Coachella Valley Unified Sch. Dist. v. California*, No. 05-02657, 2005 WL 1869499, at *2 (N.D. Cal. Aug. 5, 2005); *Fresh Start Acad. v. Toledo Bd. of Educ.*, 363 F. Supp. 2d 910, 916 (N.D. Ohio 2005); *Ass'n of Cmty. Orgs. v. N.Y. City Dep't of Educ.*, 269 F. Supp. 2d 338, 344-47 (S.D.N.Y. 2003).

a number of explanations, *see* 20 U.S.C. § 6316(b)(6), including an explanation of "the parents' option to transfer their child to another public school . . . or to obtain supplemental educational services for the child," *id.* § 6316(b)(6)(F). In addition, under 20 U.S.C. § 6311(h)(6), at the beginning of each school year, and regardless of whether the school is identified as in need of improvement, "a local educational agency that receives funds under this part shall notify the parents of each student attending any school receiving funds under this part that the parents may request, and the agency will provide the parents on request . . . , information regarding the professional qualifications of the student's classroom teachers." *Id.* § 6311(h)(6)(A). Appellants also seek to enforce their "right to request and/or receive SES" (J.A. 36) under 20 U.S.C. § 6316(e)(1)-(2), which states that in the event a school is identified for "improvement," "corrective action," or "restructuring," "the local educational agency serving such school shall . . . arrange for the provision of supplemental educational services to eligible children in the school from a provider with a demonstrated record of effectiveness, that is selected by the parents." *Id.* § 6316(e)(1).

As did the statutory provisions in *Sabree*, these statutory provisions clearly and unambiguously obligate the State to provide certain notices and to provide supplemental educational services to students when requested. This, however, does not end our inquiry, because while the provisions create law, "[w]hether the same provisions confer rights, enforceable by individuals, is another question." *Sabree*, 367 F.3d at 189.

To answer that question, we are required to determine whether the provisions at issue here pass the "*Blessing* test," that is, whether (1) appellants were the intended beneficiaries of these provisions, (2) the rights sought to be enforced by appellants are specific and enumerated rather than vague and amorphous, and (3) the obligation imposed on the State is "unambiguous and binding." *Id.* For the reasons that in *Sabree* we found the Medicaid Act to pass this test, the NCLBA's provisions also pass muster. Thus, it is plain from the terms of those provisions that students and their parents are intended to benefit from them, that the rights sought to be enforced are specific in that the provisions spell out precisely what types of notice and supplemental educational services must be given and when, and that the obligation imposed on the State is

19

unambiguous and binding. Again, however, our inquiry does not end with those conclusions.

> [T]he *Blessing* Test may only indicate that plaintiffs "fall[ ] within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself . . . ." To ensure that Congress unambiguously conferred the rights asserted, we must determine whether Congress used "rights-creating terms."

*Id.* at 189-90 (quoting *Gonzaga*, 536 U.S. at 283-84) (second brackets in original).

At this stage in *Sabree*, we found that Congress had used rights-creating language in the relevant Medicaid Act provisions based on the fact that those provisions were essentially indistinguishable from the language used in Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972—the two exemplars of rights-creating language cited by the *Gonzaga* Court. In contrast, however, the terms used in the relevant provisions of the NCLBA, while admittedly similar in some ways to the Medicaid Act's provisions, are materially distinguishable from the language found in Titles VI and IX. The command used in those statutes—"No person . . . shall . . . be subjected to discrimination"—makes its one and only subject a "person." In the NCLBA, there are two subjects: the primary subject is always the State and the "local educational agency," while "the parents of each student" are the secondary subject—they benefit from the provision but only as a result of regulation imposed upon the State and its actors. Stated somewhat differently, the focus of the NCLBA is on the entity regulated and is at least one step removed from the interests of individual students and parents, whereas the focus of the Medicaid Act is on the individuals protected rather than the entity regulated.

As is discussed above, in § 6316(b)(6) the entity being regulated is the local educational agency, while the students and their parents are the beneficiaries of that regulation. Similarly, § 6311(h)(6) states that "a local educational agency that receives

funds under this part shall notify the parents of each student" of their child's teacher's qualifications. Once again, because it is the local educational agency that is receiving federal funding (by way of the State), the Act's primary focus is on the regulation of the agency. The students and parents benefit secondarily from that regulation. So, too, with § 6316(e)(1). In the event a school is identified as needing improvement, corrective action, or restructuring, "the local educational agency serving such school shall . . . arrange for the provision of supplemental educational services to eligible children." 20 U.S.C. § 6316(e)(1).

Similarly, the supplemental educational services provisions focus on students in the aggregate, and on the lowest-achieving students and students from low-income families more specifically. In either instance, the focus is not on the individual. Section 6316(e)(1) states that local educational agencies are obligated to arrange for the provision of supplemental educational services to "eligible children." Section 6316(b)(10)(C) states that if the applicable local educational agency does not have sufficient funds to provide supplemental educational services to all eligible children, the lowest-achieving students shall be prioritized. Moreover, both of these restrictions are in addition to the State's overarching right to waive a local educational agency's obligation to provide *any* supplemental educational services under certain circumstances. *Id.* § 6316(e)(10)(A). By prioritizing certain students (low-income and the lowest-achieving) over others (higher-income and better-performing), the Act is focusing in the aggregate and not on any individual student's right to receive supplemental educational services.[6] This sort of prioritization is akin to the *Blessing* Court's conclusion that no private right of action existed under the statute at issue there because, at least in part, it focused on systemwide performance.

Moreover, as previously indicated, the provisions of the Medicaid Act with which we were concerned in *Sabree* dealt with what are essentially financial benefits, since the "medical

---

[6] Because Congress did not confer any individual rights under the Act, we need not reach the question of whether Congress evinced an intent to preclude individual suits. *See Sabree*, 367 F.3d at 193.

assistance" that the State was obligated to provide under those provisions is defined as "payment of part or all of the cost of the [specified] care and services . . . for individuals . . . who are [eligible.]" 42 U.S.C. § 1396d(a)(15). We observed in *Sabree* that the Supreme Court made a point in *Gonzaga* of distinguishing precedent that dealt with statutes extending monetary benefits to individuals. *Sabree*, 367 F.3d at 185. In particular, we noted, the Court distinguished *Wilder v. Virginia Hospital Assoc.*, 496 U.S. 498 (1990), because the issues there focused on certain provisions of the Medicaid Act that, among other things, "explicitly conferred specific monetary entitlements upon the plaintiffs" and "required States to pay an 'objective' monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirement against States that failed to comply[.]" *Id.* at 185 (quoting *Gonzaga*, 536 U.S. at 280-81, and *Wilder*, 496 U.S. at 522-23). Here, the benefits at issue are essentially non-monetary, consisting chiefly of notice and information obligations of the State that redound to the benefit of students and their parents.[7]

We must look, finally, at the overall structure of the Act. In *Sabree*, we found that other provisions within the Medicaid Act gave us some pause because they spoke in terms of an "agreement between Congress and a particular state." 367 F.3d at 191. We nonetheless found that those other provisions—the Medicaid Act's appropriations and general introductory statement and its enforcement provision—could not "neutralize" the rights-creating language we had found in the specific provisions at issue. *Id.* at 192. The NCLBA's general structure, including its introductory statement, its appropriations provisions, and its enforcement provision, also speak in terms of an agreement between Congress and a particular State.

The Act's introductory statement states that its purpose is "to ensure that all children have a fair, equal, and significant

---

[7] The supplemental educational services obligations no doubt have real cash consequences, but those obligations, too, are unlike monetary benefits, as they are waiveable by the State and may be provided directly by local educational agencies rather than being paid for by the State.

22

opportunity to obtain a high-quality education." 20 U.S.C. § 6301. While the reference to "all children" could ostensibly be read as a proclamation that each and every child shall have certain rights, Congress did not refer to the individual rights of each and every child. Indeed, the language that follows focuses on effecting this purpose by "holding schools, local educational agencies, and States accountable for improving the academic achievement of all students." *Id.* § 6301(4). The focus of this introductory statement, then, is on producing benefits to certain beneficiaries (school children) through the regulation of State actors (the local educational agencies). It thus speaks in terms of an "agreement between Congress and a particular state." *Sabree*, 367 F.3d at 191.

The NCLBA's general appropriations and enforcement provisions also evince an agreement between Congress and the States, rather than the creation of individual rights. The appropriations provision makes no mention of individuals; it simply states that for purposes of carrying out parts of the Act, Congress shall appropriate to State agencies certain amounts of money in each subsequent fiscal year. 20 U.S.C. § 6302(a). And as in *Sabree*, where the Medicaid Act's enforcement provision "empower[ed] the Secretary of HHS to suspend payments to a state if it fails to 'comply substantially' with the requirements of Title XIX," the NCLBA's enforcement provision "creates a relationship between Congress and a particular state." *Sabree*, 367 F.3d at 191-92. It provides that "[i]f a State fails to meet any of the requirements of this section, . . . then the Secretary may withhold funds for State administration under this part until the Secretary determines that the State has fulfilled those requirements." 20 U.S.C. § 6311(g)(2).

Read in concert with the less-than rights-creating language used in the notice and supplemental educational services provisions, the overall structure of the Act supports the conclusion that Congress did not intend to confer enforceable individual rights under those provisions. Again we note the contrast between this case and *Sabree*, in which we observed that our decision about a private right of action was buttressed by Supreme Court precedent addressing the identical language at issue in that case. *Sabree*, 367 F.3d at 192 ("Our confidence in this conclusion rests securely on the fact that the Court has refrained from overruling [decisions]

23

which upheld the exercise of individual rights under statutes that contain similar (or, in the case of *Wilder,* identical) provisions to [the statutory provision at issue].").  There is no such Supreme Court precedent favoring appellants here.  On the contrary, the closest analog is *Gonzaga*, which supports the conclusion that there is no private right of action.

We mentioned, as we began our discussion, that, without exception, the district courts that have considered the issue we have considered have reached the same conclusion we reach.  We close our discussion with mention of but one of those decisions, a decision we find to be particularly thorough and very much on point:  *Association of Community Organizations for Reform Now v. New York City Department of Education*, 269 F. Supp. 2d 338 (S.D.N.Y. 2003).  In that decision, the District Court, applying *Gonzaga*, held that "the notice, transfer and SES provisions do not contain the kind of 'rights-creating' language that the Supreme Court has deemed 'critical to showing the requisite congressional intent to create new rights.'"  *Id.* at 344 (quoting *Gonzaga*, 536 U.S. at 287.)

Of greatest importance to the District Court was the fact that, in its view, those provisions "focus on two entities—states and local educational agencies—and the restrictions that flow from their decisions to receive NCLBA funding."  *Id.*  Thus,

> [t]he NCLBA is drafted to focus on the regulation of these entities and not on conferring any direct benefit, entitlement or right upon individual[s], such as parents and students.  Congress, well aware of how to confer entitlements on individuals, could have drafted the NCLBA to provide that parents have the right to transfer their children or that students have the right to receive SES, but instead focused on what states and local educational agencies must provide to parents and children and on regulating the states and local educational agencies.

*Id.*  Under *Gonzaga*, the Court continued, where a statute focuses on the entity to be regulated (here, the States and local educational agencies) and the benefit to be conferred on an individual is

24

secondary, i.e., it flows to individuals as a result of the regulation of the States and local educational agencies, Congress has not created the type of individual entitlement that characterize the unambiguous intent to create personal rights.

Next, the District Court found that the Act's transfer and supplemental educational services provisions at issue have only an aggregate focus; they are not concerned with whether the needs *of any particular* person have been satisfied. The Court explained:

> [B]oth the transfer and SES provisions give priority for receiving those benefits to children from low-income families. This indicates that Congress was concerned with improving the educational conditions of children as a whole, and specifically, the condition of the subset of children from lower income families, rather than ensuring that each individual child was provided with a right to transfer out of a failing school or a right to receive SES. In addition, with respect to the transfer provisions, the terms and conditions on transfers can be altered collectively for an entire group of students because the local educational agency can enter into cooperative agreements with other local educational agencies, but those agreements are required only "to the extent practicable" and depend on the agreement of other local educational agencies. The same is true of the ability of children to receive SES, which the local educational agency may choose to waive on behalf of all of its students. The decisions whether to seek a waiver or to enter into cooperative agreements cannot be made by individual students, and are collective judgments that affect all students attending failing schools under the control of the local educational agency. As such, the NCLBA has an aggregate focus, which indicates that Congress did not intend to create individually enforceable rights under the statute.

25

*Id.* at 345[8] (citations omitted).

Finally, the District Court found that the nature of the Act's enforcement mechanism supported the conclusion that Congress did not intend to create individual rights. The Act contains no procedures—administrative or judicial—by which individuals can enforce violations of its notice, transfer, or supplemental educational services provisions. Instead, only the Secretary of Education can enforce a State's violation of the Act. Again, the Court quoted *Gonzaga*, where the enforcement scheme of FERPA was similarly centralized in the Secretary of Education: "'[i]t is implausible to presume that the Congress nonetheless intended private suits to be brought before thousands of federal-and state-court judges . . . .'" *Id.* at 346 (quoting *Gonzaga*, 536 U.S. at 290).

## IV.  Conclusion

We hold that Congress did not intend to give individuals a right to enforce the notice and supplemental educational services provisions of the Act. We will affirm the Order of the District Court.

---

[8] As this passage makes clear, plaintiffs sought to enforce their alleged right to receive supplemental educational services *and* to transfer schools. Appellants in the case before us, however, seek to enforce a right to receive the former; they do not seek to enforce a right to transfer schools but only a right to *receive notice of* their ability to transfer. (Appellants' Br. 27 n.5.)