

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-2009

# Grammer v. John J Kane Regional

Precedential or Non-Precedential: Precedential

Docket No. 07-2358

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Grammer v. John J Kane Regional" (2009). *2009 Decisions.* Paper 1092.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1092

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2358
_____

SARAH GRAMMER, as Administratrix of the
Estate of Melvinteen Daniels, Deceased,

Appellant

v.

JOHN J. KANE REGIONAL CENTERS - GLEN HAZEL
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

(D.C. No. 06-cv-00781)
District Judge:  The Honorable Gary L. Lancaster
_____

ARGUED MAY 20, 2008

BEFORE:  SMITH and NYGAARD, <u>Circuit Judges</u>,
and STAFFORD,<sup>*</sup> <u>District</u> <u>Judge</u>.

(Filed on June 30, 2009)
_____

_____

<sup>*</sup>.Honorable  William  H.  Stafford,  Jr.,  Senior  District
Judge  for  the  United  States  District  Court  for  the  Northern
District of Florida, sitting by designation.

D. Aaron Rihn, Esq. (Argued)
Robert F. Daley, Esq.
Robert Peirce & Associates
707 Grant Street
2500 Gulf Tower
Pittsburgh, PA 15219
  Counsel for Appellant


Michael R. Lettrich, Esq. (Argued)
Meyer, Darragh, Buckler, Bebenek & Eck
600 Grant Street
U.S. Steel Tower, Suite 4850
Pittsburgh, PA 15219
  Counsel for Appellee


_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

We are asked in this appeal to determine whether an action will lie under 42 U.S.C. § 1983 to challenge the treatment Appellant's decedent received (or did not receive) at the Appellee nursing home – treatment Appellant argues violated the Federal Nursing Home Reform Amendments (FNRA), 42 U.S.C. § 1396r et seq. We answer that question in the affirmative and will reverse and remand the cause to the District Court.

In so holding, we conclude that the language of the FNHRA is sufficiently rights-creating and that the rights conferred by its various provisions are neither "vague and amorphous" nor impose upon states a mere precatory obligation. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (citing *Alexander v. Sandoval*, 532 U.S. 275-288-89 (2001)). Further, we conclude that § 1983 provides the proper avenue for relief because the Appellee has failed to demonstrate that Congress

2

foreclosed that option by adopting another, more comprehensive enforcement scheme. *See Gonzaga Univ.*, 536 U.S. at 284.

## I.

Appellant's mother, Melviteen Daniels, was a resident of the John J. Kane Regional Center at Glen Hazel, in Pittsburgh, Pennsylvania. The Kane Center is a residential skilled nursing care and rehabilitation center for short-term and/or long-term needs, and is operated by Allegheny County. The Appellant maintains that, as a result of Kane Center's failure to provide proper care, her mother developed decubitus ulcers, became malnourished and eventually developed sepsis, from which she died.

Grammer sued Kane Center bringing claims under 42 U.S.C. § 1983 for wrongful death (Count I) and survival (Count II). Grammer alleged that the Kane Center deprived Mrs. Daniels of her civil rights by breaching a duty to ensure quality care under the Omnibus Budget Reconciliation Act of 1987 (OBRA) and, more specifically, the FNHRA thereto. The Kane Center filed a motion to dismiss, arguing that neither the OBRA nor the FNHRA provide a right that is enforceable through § 1983. The Kane Center maintained that the statutes merely set forth requirements a nursing facility must comply with to receive federal Medicaid funds. The District Court adopted the Magistrate Judge's recommendation finding no right of action under the statutes, and dismissed the case pursuant to Fed.R.Civ.P. 12(b)(6).

## II.

Our jurisdiction is found in 28 U.S.C. § 1291 which gives us jurisdiction over final decisions of the district courts. When deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Our

review of such a dismissal is plenary. *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001).

III.

Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396-1396v is popularly known as the "Medicaid Act." This Act established a "cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons." *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 182 (3d Cir. 2004) (citing *Pa. Pharm. Ass'n v. Houstoun*, 283 F.3d 531, 533 (3d Cir. 2002)). States are, of course, not required to participate in this program, but those that do accept federal funding must comply with the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services. *Id.*

Before Congress amended the Medicare and Medicaid Acts in 1987, only two sanctions were available against nursing homes for noncompliance with federal participation requirements. First, the Secretary of Health and Human Services or the states themselves could decertify the facility and terminate the nursing home's eligibility to receive Medicaid reimbursements. Second, if noncompliance was not an immediate and serious threat to the residents' health and safety, the Secretary or the states could deny payment for new admissions for up to eleven months. These sanctions were rarely invoked. As a result, the programs permitted too many substandard nursing homes to continue operations. Congress thus became "deeply troubled that the Federal Government, through the Medicaid program, continue[d] to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries." H.R.Rep. No. 100-3901, at 471 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1, 2313-272.

In 1987, Congress passed the FNHRA, contained in OBRA, to provide for the oversight and inspection of nursing

4

homes that participate in Medicare and Medicaid programs.[1] The requirements for certification include satisfying certain standards in areas such as "quality of care" and "resident rights." 42 U.S.C. §§ 1395i-3(g), 1396r(g).

Grammer's complaint alleged claims under § 1983 for wrongful death (Count I) and survival (Count II). Grammer contends that the Kane Center's failure to provide the standards of care delineated by the FNHRA deprived her mother of her civil rights. Grammer's complaint focuses on the following provisions of the FNHRA:

- A nursing home must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident, 42 U.S.C. § 1396r(b)(1)(A);

- A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in

---

[1] This federal legislation comes by its common name "OBRA" through the legislative process. Congress, then and now, usually completes a huge measure of its budgetary and substantive work in one large bill. The bill accomplishing that function in 1987 was entitled the Omnibus Budget Reconciliation Act of 1987 or "OBRA '87." The separate Federal Nursing Home Reform Act together with many other separate bills were "rolled into" one bill to insure final passage of all the elements. Some courts have referred to the statutory provisions at issue herein as the Federal Nursing Home Reform "Act." *See e.g. Blue v. Koren*, 72 F.3d 1018 (2d Cir. 1995). Other courts refer to these provisions collectively as the Federal Nursing Home Reform "Amendments." *See e.g. Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383 (5th Cir. 2003). We find the designation "amendments" a more accurate reflection of the legislative history.

5

accordance with a written plan of care which (a) describes the medical, nursing and psychosocial needs of the resident and how such needs will be met; 42 U.S.C. § 1396r(b)(2)(A);

- A nursing facility must conduct a comprehensive, accurate, standardized reproducible assessment of each resident's functional capacity, which assessment (i) describes the resident's capability to perform daily life functions and significant impairments in functional capacity; (iv) including identification of medical problems; 42 U.S.C. § 1396r(b)(3)(A);

- To the extent needed to fulfill all plans of care described in paragraph (2), a nursing facility must provide (or arrange the provision of) dietary services that assure the meals meet the daily nutritional and special dietary needs of each resident. Services described in clause (iv) must be provided by qualified persons in accordance with each resident's written plan of care; 42 U.S.C. § 1396r(b)(4)(A)(iv);

- A nursing facility must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a written plan of care which (C) is periodically reviewed and revised after each assessment under paragraph (3) — such assessment must be conducted (i) promptly upon (but not later than 14 days after the date of) admission for each individual admitted on or after October 1, 1990; (ii) the nursing facility must examine each resident no less frequently than once every three months and, as appropriate, revise the resident's assessment to assure the continuing accuracy of the assessment; (D) the results of such an assessment shall be used in developing, reviewing and revising the resident's plan of care under paragraph (2); 42 U.S.C. § 1396r(b)(2)(C), (b)(3)(C)(i)(l)&(ii), (b)(3)(D), (b)(4)(B);

6

- To the extent needed to fulfill all plans of care described in paragraph (2), a nursing facility must provide (or arrange the provision of) (ii) medically related services to attain or maintain the highest practicable physical, mental, and psychosocial well being of each resident; (v) an ongoing program, directed by qualified professional, of activities designed to meet the interests and the physical, mental and psychosocial well-being of each resident; 42 U.S.C. § 1396r(b)(4)(A)(ii) & (v);

- A nursing facility must maintain clinical records on all residents, which records include the plans of care (described in paragraph (2)) and the residents' assessments (described in paragraph (3)), as well as the results of any preadmission screening conducted under subsection (e)(7) of this section; 42 U.S.C. § 1396r(b)(6)(C);

- The right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and not required to treat the resident's medical symptoms, (D) Psycho-pharmacologic drugs may be administered only on the orders of a physician and only as part of a plan designed to eliminate or modify the symptoms for which the drugs are prescribed and only if, at least annually an independent, external consultant reviewed the appropriateness of the drug plan of each resident receiving such drugs; 42 U.S.C. § 1396r(c)(1)(A)(ii) & (c)(1)(D).

We are therefore presented with the question whether these various provisions of the FNHRA [2] give Medicaid

---

[2] Residents of nursing homes cannot directly sue to enforce compliance with federal standards. The statutes at issue in this case do not expressly authorize private causes of action

(continued...)

7

recipients like Melviteen Daniels rights whose violation can be remedied under § 1983. As noted, we answer in the affirmative.

IV.

A.

42 U.S.C. § 1983 is a vehicle for imposing liability against anyone who, under color of state law, deprives a person of "rights, privileges, or immunities secured by the Constitution and laws." *Maine v. Thiboutot*, 448 U.S. 1, 4-6 (1980); *see also Three Rivers Center for Independent Living v. Housing Authority of City of Pittsburgh*, 382 F.3d 412, 421-22 (3d Cir. 2004). However, a plaintiff must assert the violation of a federal right — not merely a violation of a federal law — to seek redress. *See Blessing,* 520 U.S. at 340; *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989). If a plaintiff alleges a violation of a federal right as the basis of a § 1983 action, we must determine whether the applicable federal statute confers an individual right. *Blessing,* 520 U.S. at 340. That is to say, whether a particular federal statute creates a

---

[2](...continued)
to enforce their provisions and the parties do not dispute this. Federal laws that do not explicitly authorize private causes of action may do so implicitly. Furthermore, actions for violations of federal law under 42 U.S.C. § 1983 are "presumptively available" against individuals acting under color of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). As we have indicated, "the distinction between implied private rights of action and § 1983 private rights of action rests not in the articulation of rights, but in the availability of a remedy." *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 188 n.17 (citing *Gonzaga Univ*., 536 U.S. at 285). Further, "we take it as a given that when seeking redress under § 1983 for violation of a statutory right, a plaintiff need not establish that Congress intended to confer a remedy in addition to that right." *Id*. at 183 n.7. Section 1983 itself provides the remedy. *See e.g., Gonzaga Univ*., 536 U.S. at 284.

federal right of the kind enforceable by an action for damages under § 1983 requires that we determine "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ.*, 536 U.S. at 285. A plaintiff bears the burden of establishing that a statute gives rise to federal rights enforceable through § 1983. *Blessing,* 520 U.S. 342, 346; *City of Rancho Palos Verdes, California v. Abrams*, 544 U.S. 113, 120 (2005).

B.

In *Blessing*, the Supreme Court set forth three factors courts should use to determine whether a statute conferred a federal right upon an individual: first, courts should determine whether Congress intended that the statutory provision in question benefits the plaintiff; second, courts should decide whether the right asserted is so "vague and amorphous" that its enforcement would strain judicial competence; and lastly, courts should determine whether the statute unambiguously imposes a binding obligation on the states. 520 U.S. at 340-41. The Supreme Court further instructed that if a plaintiff successfully meets these three requirements, she has established a rebuttable presumption that she has such a right. However, this presumption could be rebutted if Congress "specifically foreclosed a remedy under § 1983." *Gonzaga Univ.,* 536 U.S. at 341.

Although the *Blessing* analysis may appear straightforward, subsequent Supreme Court decisions have suggested that there are fine distinctions in its application, requiring us to look not only at the statutory text, but also to congressional intent. In *Gonzaga Univ.*, the Supreme Court applied the *Blessing* test, but noted that there had been some confusion in that test's interpretation. *Id.* at 283. The Supreme Court noted that *Blessing* had come to mean that a plaintiff could enforce a statute under § 1983 "so long as the plaintiff falls within the general zone of interest that the statute is intended to protect, something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action." *Id.* The Supreme

Court clarified the *Blessing* analysis, stating that "we now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983." *Id*. Further the Supreme Court outright "reject[ed] the notion that our implied right of action cases are separate and distinct from our § 1983 cases." *Id*. The Supreme Court advised that when determining whether a right of action is implied in a particular statutory provision, we should be guided by "the determination of whether a statute confers rights enforceable under § 1983." *Id*. Thus, *Gonzaga Univ*. clarified the *Blessing* analysis by adding the requirement that any such right be unambiguously conferred by Congress.

We applied the *Blessing* analysis, as redefined by *Gonzaga Univ.,* in *Sabree, supra*. We recently reviewed our *Sabree* decision in *Newark Parents Assoc. et al. v. Newark Pub. Schl*., 547 F.3d 199 (3d Cir. 2008), and will briefly summarize *Sabree* again here because it is the foundation for our holding in this appeal.

In *Sabree*, we were asked to decide whether a provision of the Medicaid statute that required states to provide medical services from an intermediate care facility "with reasonable promptness" to developmentally disabled persons, unambiguously conferred private rights upon them.

We first determined the characteristics of an unambiguously conferred right. We held that to confer such a right, *Gonzaga Univ*. required a statute to contain rights-creating language which clearly imparts an individual entitlement with an "unmistakable focus on the benefitted class." *Sabree,* 367 F.3d at 187 (quoting *Blessing*, 520 U.S. at 343 and *Gonzaga Univ*., 536 U.S. at 287). By way of example, we noted in *Sabree* that the Medicaid Act required that a "state plan for medical assistance . . . must provide medical assistance . . . to . . . all [eligible] individuals" and that "such assistance shall be furnished with reasonable promptness to all eligible individuals." *Id*. at 182, n.4, 189. We concluded that the statutory language requiring that a state "must provide" medical services with reasonable promptness met all three factors of the

10

*Blessing* analysis because the plaintiffs were the intended beneficiaries of the statute, the rights the plaintiffs sought to enforce were specific and enumerated and that the obligation imposed upon the states was unambiguous and binding. *Id.* at 189.

Although the plaintiffs in *Sabree* satisfied the *Blessing* test, we examined the statutes further to ensure that the unambiguous rights asserted were conferred upon the plaintiffs, and not that the plaintiffs merely fell within a "general zone of interest that the statute is intended to protect." *Id.* at 189-90. We noted that the statutory requirement that a plan "must provide" services was analogous to the "no person shall" language determined by the Supreme Court in *Gonzaga Univ.* to be an example of rights-creating language. Additionally, we determined that the statutory language was "mandatory rather than precatory." *Id.* at 190. Finally, we noted that the relevant provisions provided that such entitlements be made available to "all eligible individuals" and, as such, did not focus on the "entity regulated rather than the individuals protected." *Id.* We therefore concluded that the plain meaning of the statutory text clearly delineated rights that were both unambiguous and personal in nature, such that personal rights were indeed intended by Congress.[3]

As we see it, the Supreme Court's decision in *Gonzaga Univ.*, as interpreted by our own opinions in *Sabree* and *Newark Parents Assoc.* require us to first apply the three components of the *Blessing* test and then, to inquire into whether the statutes in question unambiguously confer a substantive right.

---

[3] The Courts of Appeal for the First, Fourth, Fifth and Ninth Circuits have all held that the same Medicaid provisions we considered in *Sabree* confer individual rights. *Bryson v. Shumway*, 308 F.3d 79, 88-89 (1ˢᵗ Cir. 2002); *Doe v. Kidd*, 502 F.3d 348, 356 (4ᵗʰ Cir. 2007); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5ᵗʰ Cir. 2004); *Watson v. Weeks*, 436 F.3d 1152, 1155 (9ᵗʰ Cir. 2006).

## C.

There is no question that the statutory provisions under which Grammer raises her claims meet the first *Blessing* factor. As both a Medicaid recipient and a nursing home resident, Grammer's mother was an intended beneficiary of 42 U.S.C. § 1396r. The Court of Appeals for the Second Circuit also has held as much. In *Concourse Rehabilitation & Nursing Center Inc. v. Whalen*, 249 F.3d 136 (2d Cir. 2001), the Court of Appeals specifically noted that Medicaid recipients were the intended beneficiaries of § 1396r. In that case, nursing homes sued the New York Department of Health, alleging violations of the Medicaid program and the FNHRA. The Court of Appeals reviewed § 1396r and determined that it did not entitle nursing homes to bring suit. Instead, the Court of Appeals held that the provisions of 42 U.S.C. § 1396r and its accompanying regulations requiring nursing facilities to "provide . . . specialized rehabilitative services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident" demonstrate clearly from the plain language of the provision that it was not "intend[ed] to benefit the putative plaintiff[s]" — the health care providers in that case. 249 F.3d at 143-44. *See also Wilder*, 496 U.S. at 509. Instead, the Court of Appeals found that the provisions were "obviously intended to benefit Medicaid beneficiaries." *Id.* at 144. We agree with this reasoning. The provisions are obviously intended to benefit Medicaid beneficiaries and nursing home residents, not the nursing homes themselves.

Moreover, unlike the statutes at issue in *Gonzaga Univ.* and *Blessing*, the FNHRA are directly concerned with "whether the needs of any particular person have been satisfied." *Blessing*, 520 U.S. at 343, quoted in *Gonzaga Univ.*, 536 U.S. at 288. In *Blessing*, for example, the Supreme Court pointed out that the statute at issue provided a "yardstick for the Secretary to measure . . . systemwide performance" of a state program. *Id.* at 343. Here, in contrast, the FNHRA' concern is whether each individual placed in a nursing home receives proper care.

The second *Blessing* factor is also met here. The rights Grammer asserts are not so "vague or amorphous" that their

12

enforcement would strain judicial resources. The various rights are clearly delineated by the provisions at issue. The repeated use of the phrases "must provide," "must maintain" and "must conduct" are not unduly vague or amorphous such that the judiciary cannot enforce the statutory provisions. These provisions make clear that nursing homes must provide a basic level of service and care for residents and Medicaid patients.

Finally, the language unambiguously binds the states and the nursing homes as indicated by the repeated use of "must." This language is mandatory in nature and easily satisfies the third factor of the *Blessing* test.

D.

As we held in *Sabree*, *supra*, meeting *Blessing's* "zone of interest" factor is not enough. In *Gonzaga Univ.*, the Supreme Court cautioned us to be careful to ensure that the statute at issue contains "rights-creating language" and to make certain that the language is phrased in terms of the persons benefitted, not in terms of a general "policy or practice." 536 U.S. at 287. While *Blessing* stands for the proposition that violations of rights, not laws, give rise to § 1983 actions, nevertheless, the *Gonzaga Univ.* court warned against interpreting *Blessing* "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ.,* 536 U.S. at 283. Therefore, nothing short of an "unambiguously conferred [individual] right" as demonstrated through "rights-creating language" can support a § 1983 action. *Id.* at 283, 290.

The Supreme Court explained that rights-creating language must clearly impart an individual entitlement, and have an "unmistakable focus on the benefitted class." *Id.* (quoting *Blessing*, 520 U.S. at 343; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690-93, (1979)). The Supreme Court next demonstrated the type of rights-creating terms that unambiguously confer enforceable rights by looking to its implied right of action cases. *Id.* at 283-84. To exemplify rights-creating language, the Supreme Court looked to the

13

language of Title VI of the Civil Rights Act of 1964, stating that "No person in the United States shall ... be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race, color or national origin, and Title IX of the Education Amendments of 1972, stating "No person in the United States shall, on the basis of sex ... be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* at 284 n.3 (quoting 42 U.S.C. § 2000d (emphasis added); 20 U.S.C. § 1681(a)).

Comparing the language of the statute at issue in *Gonzaga Univ.* — the Family Educational Rights and Privacy Act of 1974 (FERPA) --- to the rights-creating language used in Title VI and Title IX, the Court found that FERPA's provisions, stating "no funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice," were in stark contrast to Title VI and Title IX. *Id.* at 283.

*Gonzaga Univ.* found that the specific mandatory, individually focused language of Titles VI and IX confer individual rights, while the programmatic, aggregate focus of FERPA's language merely created law applicable to the states. We must, therefore, compare the language of the statutes at issue in Grammer's case, namely, 42 U.S.C. § 1396r, et seq. to Title VI, Title IX, and FERPA, to determine whether Congress used rights-creating language before proceeding to the remaining steps in the *Blessing* analysis.

In *Sabree*, we compared 42 U.S.C. §§ 1396a(a) (8), 1396a(a)(10), and 1396d(a)(15) to Title VI, Title IX and FERPA, and found that those sections of the Medicaid Act did create individually enforceable rights. Determining whether Congress used rights-creating language when drafting § 1396a(a)(8), we found that in requiring states that accept Medicaid funding to provide ICF/MR services with reasonable promptness, Congress conferred specific entitlements on individuals "in terms that could not be clearer." 367 F.3d at 190 (quoting *Gonzaga Univ.*, 536 U.S. at 280). Specifically, §

14

1396a(a)(8) provides, in pertinent part, "[a] State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." Particularly relevant to the existence of rights-creating terms in *Sabree* was our determination that the terms of the statutory provisions at issue were "mandatory rather than precatory," they had an "individual focus" on "all eligible individuals," and even though they inform the state of its compliance requirements, the terms do not focus on the "entity regulated rather than the individuals protected." *Id*. at 190.

The FNHRA are replete with rights-creating language. The amendments confer upon residents of such facilities the right to choose their personal attending physicians, to be fully informed about and to participate in care and treatment, to be free from physical or mental abuse, to voice grievances and to enjoy privacy and confidentiality. 42 U.S.C. § 1396r(c)(1)(A). Nursing homes are required to care for residents in a manner promoting quality of life, provide services and activities to maintain the highest practicable physical, mental and psychosocial well-being of residents, and conduct comprehensive assessments of their functional abilities. 42 U.S.C. § 1396r(b)(1), (2) & (3). Further, the statute specifically guarantees nursing home residents the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and not required to treat their medical symptoms. 42 U.S.C. § 1396r(1)(A)(ii).

As they were in *Sabree*, the provisions at issue here are mandatory. For example, by stating "a nursing home *must care* for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident," the mandatory nature of the provision is apparent. 42 U.S.C. § 1396r(b)(1)(A) (emphasis added). Another provision of the FNHRA provides that "a nursing facility *must provide* services and activities to attain or maintain the highest practicable physical, mental and psychosocial

15

well-being of each resident." 42 U.S.C. § 1396r(b)(2)(A) (emphasis added). These provisions, as well as the others under which Grammer brought claims, are strikingly similar to those at issue in *Sabree*. In *Sabree*, we found the phrase "a state plan of medical assistance must provide," to be rights-creating. *See Sabree,* 367 F.3d at 190.

Additionally, the FNHRA use the word "residents" throughout. Thus, its provisions are clearly "phrased in terms of the persons benefitted." *See Gonzaga Univ.*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 692 n.13). Moreover, no provision uses the word "resident" simply in passing. Instead, the FNHRA are constructed in such a way as to stress that these "residents" have explicitly identified rights, such as "the *right* to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and not required to treat the resident's medical symptoms." 42 U.S.C. § 1396r(c)(1)(A) (emphasis added). These statutory provisions are, in other words, "concerned with 'whether the needs of any particular person have been satisfied,'" not solely with an aggregate institutional policy and practice. *Id.* at 288 (quoting *Blessing*, 520 U.S. at 343).

We are not concerned that the provisions relied upon by the Appellant are phrased in terms of responsibilities imposed on the state or the nursing home. The plain purpose of these provisions is to protect rights afforded to individuals. *See e.g., Johnson v. Housing Auth. of Jefferson Parish*, 442 F.3d 356, 360, 363 (5th Cir. 2006) (finding a right of action by low-income families even though the provision at issue required payments be made to landlords as opposed to being made to the intended beneficiaries of the statute, low-income families). Further, the statutory provisions relied upon by the Appellant are distinguishable from the FERPA provision the Supreme Court found to be "two steps removed from the interests of individual students and parents." *Gonzaga Univ.,* 536 U.S. at 287. The FERPA provision at issue in *Gonzaga Univ.* concerned policies and practices that must be in place to obtain federal funding. In this case, the provisions under review directly impact the

16

individual in that they determine the level of care and service an individual is to receive. The various provisions of the FNHRA at issue here place an "unmistakable focus on the benefitted class — Medicaid recipients who are residents of Medicaid participating nursing homes. *See Gonzaga Univ.*, 536 U.S. at 284.

The legislative history of the enactment of the FNHRA is likewise compelling when determining Congressional intent to create a right of action. In *Rolland*, 318 F.3d at 45-47, the Court of Appeals for the First Circuit examined the legislative history of the FNHRA at length, and it bears repeating here:

> In 1987, Congress passed the NHRA, part of the Omnibus Budget Reconciliation Act, as a response to th[e] apparently widespread problem [of mentally ill and mentally retarded individuals being placed in nursing homes that were unable to provide the necessary and appropriate services and treatments]. The report from the House of Representatives began:
>
> "Substantial numbers of mentally retarded and mentally ill residents are inappropriately placed, at Medicaid expense, in [skilled nursing facilities] or [intermediate care facilities]. These residents often do not receive the active treatment or services that they need. A recent [Government Accounting Office] review of mentally retarded residents in [these facilities] in Connecticut, Massachusetts, and Rhode Island concluded that the active treatment needs of these individuals were generally not being identified or met."
>
> The NHRA attempted to ensure that those placed in nursing homes actually needed nursing care and that once residing in a nursing home, individuals would receive the other kinds of treatment they needed. Towards that end, the NHRA established requirements for nursing

17

homes in their care of mentally retarded [and mentally ill] residents, 42 U.S.C. § 1396r(b); instituted specific enumerated rights for residents, id. § 1396r(c); and required states to screen and provide services to mentally retarded [and mentally ill] residents, id. § 1396r(e).

*Rolland*, 318 F.3d at 46 ( quoting H.R.Rep. No. 100-391, pt. 1, at 459, reprinted in 1987 U.S.C.C.A.N. 2313-279).[4] In concluding that § 1396r created a private right of action, the Court of Appeals in *Rolland* found that

> [t]he NHRA speaks largely in terms of the persons intended to be benefitted, nursing home residents.... The statute contains a laundry list of rights to be afforded residents and commands certain state and nursing home activities in order to ensure that residents receive necessary services. In short, after clearly identifying those it seeks to protect, the statute goes on to endow them with particular rights, utilizing "rights-creating" language.

*Rolland*, 318 F.3d at 53.

Just as we held in *Sabree*, we hold here that the specific rights conferred by the FNHRA could not be clearer. Indeed, the

---

[4] We recognize that the Supreme Court cautioned that we should consider specific statutory provisions as opposed to a statute as a whole in determining whether an enforceable right exists. *Blessing*, 520 U.S. at 342-43. Nonetheless, courts often consider the legislative history of the entire statute in determining Congressional intent. *See, e.g., Wilder*, 496 U.S. at 516-17; *Rabin*, 362 F.3d at 196-97 ("[T]he interpretation given to the statute must be consistent with the congressional purpose for enacting it.") (citing *Holloway v. U.S.*, 526 U.S. 1, 9 (1999)).

rights-creating language here may be even stronger than the language at issue in *Sabree* as Congress explicitly included the word "rights" when identifying the expectations and entitlements of nursing home residents. See 42 U.S.C. § 1396r(c)(1)(A). Viewing the terms of the FNHRA next to Title VI, Title IX, FERPA, and Medicaid's reasonable promptness provisions, through the lens of *Gonzaga Univ.*, we hold that Congress did use rights-creating language sufficient to unambiguously confer individually enforceable rights.

E.

We have one final step in our analysis. The Supreme Court instructs that we are to examine not only the text of the statute at issue, but also its structure to satisfy ourselves that it is sufficiently rights-creating. *See Gonzaga Univ.*, 536 U.S. at 286; *see also Sabree*, 367 F.3d at 191. As we did in *Sabree*, we look beyond the provisions identified by the Appellant and instead change our focus to the structural elements of Title XIX as a whole. The scenery has not changed since our opinion in *Sabree*. We recognize that provisions within the Medicaid Act speak in terms of an "agreement between Congress and a particular state." *See Sabree*, 367 F.3d at 191. Other provisions, 42 U.S.C. § 1396(c) for example, empower the Secretary of Housing and Human Services to suspend payments to a state if it fails to "comply substantially" with the title's requirements. These provisions gave us pause in *Sabree*, and they continue to cause us some reticence today. *See Sabree,* 367 F.3d at 191; *Newark Parents Ass'n.,* 547 F.3d at 211-12. *Sabree* counsels, however, that we must consider the existence of rights-creating language in other relevant statutory provisions of Title XIX. *Sabree*, 367 F.3d at 192. We found that the existence of other provisions (Medicaid's appropriations and enforcement provisions, for example) could not "neutralize" the rights-creating language that was found in the specific provisions at issue. *Id*. Thus, *Sabree* created a test whereby courts should balance the strength of the specific language of the statutory provisions at issue against the larger structural

19

elements of the statute.[5]  The language used throughout the FNHRA is explicitly and unambiguously rights-creating, despite the countervailing elements of the statute.  The larger statutory structure, therefore, does not neutralize the rights-creating language contained throughout the FNHRA.

F.

Accordingly, the various provisions of the FNHRA under which Grammer sues do confer individual rights that are presumptively enforceable through § 1983.  The burden  shifts to the Kane Center to rebut the presumption of an enforceable right under § 1983.  *Sabree*, 367 F.3d at 193.  The Kane Center has not satisfied its burden here, as it fails to argue that Congress precluded individual enforcement of the rights conferred by the FNHRA in any way.  Moreover, our independent examination and assessment of the Medicaid Act disclosed no evidence of congressional intent to preclude enforcement of the rights created by the various provisions of this statute.  This is so because no provision contains express terms to that effect and no comprehensive remedial scheme is established by the provisions at issue.  *See Gonzaga Univ.*, 536 U.S. at 284-85; *Blessing,* 520 U.S. at 341.  As we held in *Sabree*, "Title XIX contains no provisions explicitly precluding individual actions."  367 F.3d at 193.

V.

In sum, it is clear enough that Congress intended to create individual rights in drafting and adopting § 1396r, and that Appellant's mother falls squarely within the zone of interest these provisions are meant to protect.  Hence, we hold that the statutory provisions which Grammer seeks to enforce under § 1983 satisfy both *Gonzaga Univ.'s* insistence on rights-creating

---

[5] By comparison, we determined that the "less-than rights-creating language" found in *Newark Parents Ass'n*. was neutralized by the overall structure of the No Child Left Behind Act, 20 U.S.C. § 6301 et seq.  547 F.3d at 211-12.

language as evidence of Congressional intent and *Blessing's* remaining factors. We will reverse the order of the District Court and remand the cause for further proceedings.

*STAFFORD, District Judge, dissenting.*

Because I cannot agree that the district court erred in granting the defendant's motion to dismiss, I must respectfully dissent. The district court determined—I believe correctly—that Appellant may not sue Appellee, a nursing home, for violations of 42 U.S.C. § 1396r under 42 U.S.C. § 1983.

The Medicaid Act (the "Act"), which contains the statutory provisions allegedly violated by Appellee, is Spending Clause legislation. Spending Clause legislation rarely confers upon funding beneficiaries the right to bring private actions "before thousands of federal- and state-court judges" against funding recipients. *Gonzaga*, 536 U.S. at 290; *Newark Parents Ass'n*, 547 F.3d at 205, 214 (this circuit's latest foray into the rights-creating-language thicket). The Supreme Court has been explicit: "[U]nless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983." *Gonzaga*, 536 U.S. at 280 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17). In section 1396r, Congress did not speak with a "clear voice" or manifest an "unambiguous intent" to provide a basis for private enforcement of funding requirements under section 1983.

The Supreme Court in *Gonzaga* emphasized that "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Gonzaga*, 536 U.S. at 287 (internal quotations marks and citations omitted). In *Newark Parents Ass'n*, this court likewise recognized that "where a statute focuses on the entity to be regulated . . . and the benefit to be conferred on an individual is secondary, i.e., it flows to individuals as a result of the regulation of the States and [recipient] agencies, Congress has not created the type of individual entitlement that characterize [sic] the unambiguous

21

intent to create personal rights." *Newark Parents Ass'n*, 547 F.3d at 213.[6]

Under the Medicaid Act, the federal government directs funding to states to assist them in providing medical assistance to certain eligible individuals. To receive federal funds under the Medicaid Act, states are required to administer low-income medical assistance programs pursuant to "State plans" approved by the Secretary of Health and Human Services. The Act sets forth detailed requirements for state plans. Among many other things, the Act provides that "[a] State plan for medical assistance must . . . provide . . . that any nursing facility receiving payments under such plan must satisfy all the requirements of subsections (b) through (d) of section 1396r." 42 U.S.C. 1396a(a)(28)(A). Section 1396r lists the requirements that nursing facilities—as recipients of federal funding—must

---

[6.] In *Gonzaga*, 536 U.S. at 285, the Court explained that "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." In the implied right of action context, federal courts have consistently held that no implied private right of action exists under the Medicaid Act, OBRA, or FNHRA. See, e.g., Prince v. Dicker, No. 01-7805, 29 Fed. Appx. 52, 2002 WL 226492 at *2 (2d Cir. 2002) (holding, with no discussion, that 42 U.S.C. § 1396r did not confer a private right of action that could be enforced against a private nursing home); Brogdon v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1330-32 (N.D. Ga. 2000) (finding that Congress did not intend to authorize nursing home residents to file suit against nursing facilities to enforce the section 1396r standards required for participation in the Medicaid program); Sparr v. Berks County, 2002 WL 1608243 *2-3 (E.D. Pa. July 18, 2002) (dismissing action brought by executor of patient's estate against the nursing home for violations of the FNHRA, finding that although the statute was enacted to benefit the plaintiff, there was nothing in the legislative purpose or history to suggest that Congress intended to create a private right of action).

meet relating to the provision of services to its Medicaid patients.  Importantly, in each of the provisions in subsections (b) through (d), namely, subsections (b)(1)-(8), (c)(1)-(8) and (d)(1)-(4), Congress began by stating: "The nursing facility must . . . "  In each case, the focus is on what the nursing facility must do in return for federal funds; the focus is *not* on the individuals to whom the benefit of each provision flows.[7]

In *Gonzaga*, the Supreme Court noted that its "more recent decisions . . . have rejected attempts to infer enforceable rights from Spending Clause statutes."  *Id.* at 281.  Whatever *Sabree* may say as to section 1396a, I do not agree that Congress intended to confer upon nursing home residents the right to invoke section 1983 to sue individual nursing homes for alleged violations of the non-monetary service requirements set forth in section 1396r.  The district court properly dismissed the case, and we should affirm.

---

[7.]  In *Newark Parents Ass'n*, this court compared the language used in the No Child Left Behind Act ("NCLBA") (the statute at issue in *Newark)* with the language used in the two exemplars of rights-creating language cited by the *Gonzaga* Court (Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972), stating as follows:
> [T]he terms used in the relevant provisions of the NCLBA . . . are materially distinguishable from the language found in Titles VI and IX.  The command used in those statutes—"No person . . . shall . . . be subjected to discrimination"—makes its one and only subject a "person."  In the NCLBA, there are two subjects: the primary subject is always the State and the "local educational agency," while "the parents of each student" are the secondary subject—they benefit from the provision but only as a result of regulation imposed upon the State and its actors.

*Newark Parents Ass'n*, 547 F.3d at 210.